ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTICT OF GEORGIA
### ATLANTA DIVISION

APR 0 1 2008

JAMES N. HATTEN, CLERK
By: _____
Deputy Clerk

| | | |
|---|---|---|
| UNITED STATES OF<br>AMERICA,<br>ex rel, SHIRLEY T. SMALL,<br><br>Plaintiff-Relator<br><br><br>vs.<br><br>THE MEDICAL CENTER, INC.<br>a/k/a COLUMBUS REGIONAL<br>HEALTHCARE SYSTEM, INC.<br>d/b/a John B. Amos Cancer<br>Center, RADIATION<br>ONCOLOGY OF COLUMBUS,<br>PC., DOUGLAS F. CIUBA, M.D.<br>and THOMAS F. CABELKA II,<br>M.D.<br><br>Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION<br>FILE NO.<br># 1:08-CV-1273<br><br>COMPLAINT<br>(Jury Trial Demanded)<br><br><br>**Do not place in Press Box**<br>**Do not enter on Pacer** |

## FILED IN CAMERA AND UNDER SEAL
### Pursuant to 31 U.S.C. 3720(b)(2)

1

## Plaintiff-Relator's Complaint

Plaintiff, United States of America ex rel. Shirley Small, by and through her attorneys and complaining of the defendants for her complaint alleges:

## Jurisdiction and Venue

1.     This action arises under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* This Court has jurisdiction over this case pursuant to 31 U.S.C. §§ 3732(a) and 3730(b), 28 U.S.C. § 1345 and 28 U.S.C. § 1331. Plaintiff's claim exceeds the sum of or value of $75,000, exclusive of interests and costs.

2.     Venue is proper under 28 U.S.C. § 1391(a)(1) in that, on information and belief, defendants reside in this judicial district within the meaning of 28 U.S.C. § 1391(c) in that each defendant's contacts in this district would be sufficient to subject it to personal jurisdiction here if this district were a separate State.

3.     As required under the False Claims Act, 31 U.S.C. § 3730(a)(2), Relator has provided the Attorney General of the United States and the United States Attorney for the Northern District of Georgia with a statement disclosing all material evidence and information known to Relator supporting this filing and establishing the existence of defendants' false claims. Because the statement includes attorney-client communications and work product of Relator's attorneys, and is submitted to the Attorney General and to the United States Attorney in their capacity as potential co-counsel in the litigation, the Relator understands this disclosure to be confidential.

4.     The actions attributed to defendants in this complaint were taken by employees and/or agents of defendants acting within the scope of their employment and/or agency with defendants.

5.     This complaint supports reasonable cause to allege that defendants individually and collectively knowingly or recklessly submitted, caused to be submitted, or conspired with each other to submit false claims to the federal government by systematically billing, or making, using, or causing to be made false records or statements in support of billing, Medicare,

Medicaid, TRICARE/CHAMPUS, and CHAMPVA (collectively "Federal Payors") for radiation therapy cancer treatment and other related treatment pertaining to the care of cancer patients at the John B. Amos Cancer Center (hereinafter "Cancer Center") where, in fact, treatments billed were not, under applicable federal regulations, delivered. These claims for payment by the defendants, by any means, for services, products or costs constitute false claims in violation of the False Claims Act.

6.     Relator is the original source of the information described in this complaint.

In Camera Review

7.     Under the provisions of 31 U.S.C. 3730(a)(2), this Complaint is to be filed in camera and is to remain under seal for a period of at least 60 days and shall not be served on any defendant until the Court so orders. The Government may elect to intervene and proceed with the action within 60 days after it receives both the Complaint and the material evidence and information establishing the cause of action.

Parties

8.     Plaintiff Shirley Small, the Relator in this action, is a citizen of the United States and resident of the State of Wisconsin who is currently self-employed as Locum Medical Physicist working under contract at R.L. Schneider Regional Medical Center, St. Thomas, U.S. Virgin Islands, where she began work on January 17, 2008. Relator earned her Master of Science in Radiological Physics from the University of Cincinnati Medical College, in 1980. At all times relevant to this Complaint and continuing to the present, Relator has been registered with the State of Indiana as a Qualified Radiation Physicist for all diagnostic and therapeutic medical uses. Since 1995, Relator has been a full Member of the Association of Physicists in Medicine. As recently as 2001, Relator was licensed by the Nuclear Regulatory Commission as a Radiation Safety Officer. Since March of 2007, Relator has been a Member in Physics of the American College of Radiology.

9.     Relator brings this action based on her direct, independent and personal knowledge and on information and belief.

10.   The United States of America funds and regulates federal medical care reimbursement programs for civilian beneficiaries through the Center for Medicare and Medicaid Services ("CMS"), an agency of the U.S. Department of Health and Human Services ("DHHS"); for military beneficiaries, through the TRICARE/CHAMPUS program administered by the Military Health System, an agency of the Department of Defense; and for veterans and their dependents and survivors, though CHAMPVA, a program administer by the Health Administration Center of the Department of Veterans Affairs.

11.   All Federal Payors make payments retrospectively (after services have been performed) to hospitals and doctors who perform reimbursable services to covered beneficiaries.

12.   Defendant The Medical Center, Inc. (hereinafter "TMC") is a Georgia non-profit corporation headquartered in Columbus, Georgia, location of the U.S. Army's Fort Benning, one of the largest military installations in the United States.  TMC treats Medicare, Medicaid, TRICARE/CHAMPUS and CHAMPVA beneficiaries afflicted with, among other things, various forms of cancer through TMC's oncology department, the John B. Amos Cancer Center (hereinafter "Cancer Center").

13.   Defendant Radiation Oncology of Columbus ("ROC") is a Georgia professional corporation that performs the professional service component of radiation oncology services provided to cancer patients by the Cancer Center.  ROC is owned, in part, by Thomas F. Cabelka II, M.D. ("Cabelka") and Douglas F. Ciuba, M.D. ("Ciuba").

14.   Defendant Ciuba is and was licensed as a medical doctor by the Georgia Composite State Board of Medical Examiners, certified in Radiation Oncology by the American Board of Radiology, and Chief Financial Officer of ROC, staff Radiation Oncologist at the Cancer Center, at all times relevant to the accompanying Complaint.

15.   Defendant Cabelka is and was licensed as a medical doctor by the Georgia Composite State Board of Medical Examiners, certified in Radiation Oncology by the American Board of Radiology, Chief Executive Officer of ROC, staff Radiation Oncologist at the Cancer Center, at all times relevant to the accompanying Complaint.

16.     Defendants individually and working in concert with each other provide medical and healthcare services to the public and receive funds from the Medicare, TRICARE/CHAMPUS, CHAMPVA, and Medicaid programs. The submission of claims by defendants to these programs for payment or reimbursement includes a representation and certification that defendants will abide by and have abided by and that they will adhere to and have adhered to all the statutes, rules, and regulations governing the Medicare, TRICARE/CHAMPUS, CHAMPVA and Medicaid programs.

Facts

### People and Organizations

17.     The Medical Center Hospital Authority was created and operates pursuant to the Georgia Hospital Authorities Act as a "public body corporate and politic" under Georgia law and is the owner of TMC.

18.     Columbus Regional Healthcare System, Inc. is owned by The Medical Center Hospital Authority.

19.     Team Staff Rx is a Clearwater, Florida-headquartered subsidiary of Somerset, New Jersey-headquartered Team Staff, Inc. and provides staffing services of medical professionals to hospitals and other medical care organizations.

20.     Relator Shirley Small served as a medical physicist at TMC from December 18, 2006 to October 31, 2007 through staffing services provided by Team Staff Rx.

21.     Revenue Cycle, Inc. (hereinafter "RCI") is a Nevada corporation currently headquartered in Austin, Texas that provides coding, billing and practice management services and related training to oncologists and hospitals throughout the United States. Between approximately 2003 and January 2007, RCI was under contract to provide a variety of training, consulting and billing management services including chart audits to TMC.

### Medical Technology & Terminology

22.     Radiation oncology is a branch of medicine that employs ionizing radiation as a means to shrink or kill cancerous tissue in cancer patients. In

radiation oncology, a medical doctor trained as a radiation oncologist oversees the planning and delivery of radiation treatments. The radiation oncologist is typically assisted by various trained technical staff, including a medical physicist.

23.    In radiation oncology, the medical physicist is responsible for calibrating radiation sources used both diagnostically and therapeutically, accurate dosimetry for all modalities of radiation therapy patient treatments, routine review of patient treatment charts to ensure that the Radiation Oncologist's prescription is being carried out correctly, and compliance with radiation source regulations and medical physics professional standards of practice including quality assurance program management.

24.    Intensity Modulated Radiation Therapy ("IMRT"), 3-Dimensional Conformal Radiation Therapy ("3DCRT"), Conventional Radiation Therapy, and Prostate Seed Implant ("PSI") each involve the exposure of tissue in a patient's body to carefully calculated doses of radiation designed to shrink or kill cancerous tissue. PSI is a form of brachytherapy.

25.    IMRT, an advanced form 3DCRT, uses sophisticated software and hardware to vary the shape and intensity within each beam of radiation delivered to different parts of the treatment area and is one of the most precise forms of external beam radiation therapy currently available.

26.    Like 3DCRT, IMRT utilizes CT scanned images of the patient in the treatment position. The area can then be visualized in three dimensions in the treatment planning software where the cancer target is defined by the MD. However, 3DCRT and IMRT differ in how the pattern and volume of radiation delivered to the tumor is determined.

27.    In 3DCRT, clinicians input delivery patterns into the computer. In IMRT, the treatment planning process begins with the physician designating specific doses of radiation (constraints) that the tumor and normal surrounding tissues should receive. Subsequently, in a process known as "inverse treatment planning," the physics team led by a medical physicist uses computer software to develop an individualized treatment plan to meet the constraints.

28.    IMRT uses the same medical linear accelerators that deliver x-ray beams in 3DCRT but IMRT goes beyond 3DCRT by using dynamic multi-

leaf collimators ("DMLCs") -- computer-controlled devices that use up to 120 movable "leaves" -- to conform the radiation beam to the shape of the tumor from any angle while protecting normal adjacent tissue as much as possible.

29.    DMLCs allow the dose of radiation to vary within a single beam. In other words, it can deliver higher radiation in some areas and lower radiation in others. The ability to vary the radiation dose with DMLCs is accomplished by "sliding windows" of radiation beams across the target cancerous area.

30.    DMLCs function like a shower head with many nozzles, where the water represents radiation. 3DCRT technology allows only a constant flow of water to be delivered through all nozzles.  In contrast, with properly calibrated DMLCs, individual nozzles may be turned off and on or set to deliver "water" at different flow rates.  The different flow rates are analogous to variable radiation dose intensities or beamlets within each treatment field.  The variable radiation dosage intensities can then be "wrapped" around or "painted" within tumors far more precisely than possible with conventional 3DCRT technology.

31.    IMRT treatment may require more total daily treatments each of which requires more time per day to deliver than 3DCRT.  Generally, IMRT produces fewer and less serious side effects than 3DCRT because sensitive structures adjacent to targeted areas can be better avoided.  However, in either IMRT or 3DCRT, failure to properly plan the treatment and control the delivery of the radiation can result in serious injury or death either from misdirected radiation or unsuccessful treatment.

32.    PSI involves the implantation of 80-130 radioactive Iodine 125 or Palladium 103 granules or "seeds" that emit low energy X-rays which, if properly placed, destroy the surrounding cancer in the prostate with minimal dose to the adjacent critical structures.  Failure to properly place and monitor the seeds can result in failure to eliminate the cancer or serious injury to surrounding tissue.

33.    Prior to PSI implantation, the radiation oncologist maps the prostate gland from a prostate ultrasound scan called a volume study.  A radiation physicist and radiation oncologist then use the volume study to determine the number of seeds and the exact geometric placement of the seeds within

the prostate.

34.    PSI seeds are implanted through thin needles containing a specific number of seeds.  The loaded needles are inserted into the prostate gland through the skin between the scrotum and the rectum. As the needles penetrate through the prostate, they are seen on the screen of the ultrasound machine and can be accurately guided to their final position. After each needle is in the correct position in the prostate, the needle is slowly withdrawn depositing the seeds as planned.  Post implant CT scans are acquired to evaluate the delivered radiation dose by performing a post implant CT-based treatment plan.

35.    A medical sentinel event is an unexpected occurrence involving death or serious physical or psychological injury, or the risk thereof.  Serious injury specifically includes loss of limb or function.  The phrase, "or the risk thereof" includes any process variation for which a recurrence would carry a significant chance of a serious adverse outcome.  Such events are called "sentinel" because they signal the need for immediate investigation and response.

### Billing Process & Technology

36.    Under Medicare, services charges for patient care are separated into two major groupings: Hospital charges (Medicare Hospital Part A) and physician charges (Medicare Physician Part B).

37.    Medicare reimburses hospital services through what is known as the Prospective Payment System ("PPS") in which Medicare reimburses the hospital prospectively with reference to a fee schedule adjusted for local and hospital-specific cost factors.  Later, through the year-end cost-report process, CMS settles over- or under-reimbursements.

38.    Medicare reimburses physician services based on a fee schedule adjusted for local cost factors.  In establishing the fee schedule, CMS has adopted a comprehensive system of coding for services established by the American Medical Association (AMA). The Current Procedural Terminology (CPT) codes describe thousands of services using a five digit code with a narrative explanation of the use of the code. In certain cases, CMS has added codes to describe services not covered by CPT codes.

39.    Under Medicare, detailed regulations governing reimbursement eligibility are provided in the form of National Coverage Determinations ("NCDs"), Local Coverage Determinations ("LCDs"), and policy articles. NCDs are drafted and published by the Centers for Medicare and Medicaid Services ("CMS"). LCDs and policy articles are drafted or adopted by Medicare contractors.

40.    At the Cancer Center, patient technical charges are entered into the IMPAC Treatment Record and Verify system by the person performing the billable task, or by auto entry, when the task is completed on the treatment machine. IMPAC reports accumulate CPT codes that are exported daily by the Cancer Center to TMC's SMS or Athena (software elements of TMC's billing system) billing software which generates reimbursement requests sent to all payors including Federal Payors.

41.    Prior to January 31, 2007, when the "ongoing consulting agreement" between TMC and RCI terminated, RCI attempted to get Cabelka, Ciuba, TMC, and Cancer Center management to acquire the coding expertise, hire appropriate personnel, and establish necessary processes to ensure accurate coding, but adequate processes never took hold because TMC management, Cabelka and Ciuba consistently, knowingly or recklessly, failed to provide personnel, management oversight and other controls necessary to implement RCI's recommendations.

42.    After January 31, 2007 and before October 31, 2007, CPT codes for technical treatment procedures submitted through the IMPAC reports by radiation oncology staff as part of IMRT, PSI and 3DCRT cancer treatment plans were generally not subjected to further substantive review or routine audit by TMC or the Cancer Center because after RCI's exit, no one on site had the necessary coding expertise.

## Cancer Center Treatment Volumes, Pay Rates and Revenues

### Aggregate data

For the fiscal year ended June 30, 2007, Cancer Center radiation therapy billings totaled approximately $24 million[kss1] of which approximately $4.9 million was provided by 3,972 daily IMRT treatments (CPT Code 77418); $521,378 by 193 IMRT plans (CPT Code 77301); $1,103,710 by 305 3DCRT Simulations (CPT Code 77295); $3,489,022 by 6,846 3DCRT

daily treatments; and $25,000 from roughly 44 PSI-related claims (various CPT codes, including 77295, 77328 and 76873).

43.     During the sixteen months ended April 30, 2007, Medicare and TRICARE denied [kss2]a combined total of 935 Cancer Center claims representing aggregate billings of $122,898.

44.     Approximately one third of all Cancer Center patients treated with external beam radiation therapy receive either the entire treatment course or the boost portion of their treatment through IMRT technology.[0]

45.     External beam radiation is a general term denoting radiation treatment -- including 3DCRT, IMRT and non-3D delivery modes -- administered through a linear accelerator.  The vast majority of Cancer Center external beam treatments are delivered through IMRT or 3DCRT technology.

46.     On information and belief, between 60 and 70 percent[kss3] of the Cancer Center's radiation therapy procedures delivered between 2002 and 2008 were reimbursed by Federal Payors.

47.     In June 2007, the Cancer Center projected patient revenues from radiation therapy for the fiscal year ending June 30, 2008 of approximately $28.6 million[kss4].

48.     In addition to Hospital Technical charges billed to Medicare by TMC, for nearly every radiation oncology treatment plan and treatment, defendants ROC, Ciuba and Cabelka also bill to Medicare Physician Professional Medicare Part B charges.

49.     In a hospital-based treatment center, technical charges (also known as Medicare Part A charges) are billed by the hospital while professional charges (also known as Medicare Physician Part B charges) are billed by the medical doctor.  However, in a so-called "free-standing" treatment center (as opposed to a hospital-based center), Medicare Part A charges can be billed by the medical doctor.

50.     The radiation oncology patient populations of TMC and ROC are nearly identical and, therefore with few exceptions, when a radiation oncology patient is treated at the Cancer Center, that treatment is or should be supervised by one of ROC's physician officers, Cabelka or Ciuba.

51.   Nearly all of the radiation oncology patients billed by defendant
Cancer Center under Medicare Part A, are also billed by defendants ROC,
Cabelka and Ciuba, individually or collectively, for corresponding physician
fees under Medicare Part B.

## IMRT Data

52.   During calendar 2006, the Cancer Center billed to all payors
approximately 206 IMRT treatment plans (CPT Code 77301) and 3,558
daily IMRT treatments (CPT Code 77418) and hundreds of other procedures
associated with other IMRT-related CPT codes.

53.   During calendar 2006, the Cancer Center's Hospital Technical
Medicare Part A pay rates for CPT Codes 77301 and 77418 approximated
the national average of $862.12 and $318.82, respectively.

54.   During calendar 2007, the Cancer Center's Hospital Technical
Medicare Part A pay rates for CPT Codes 77301 and 77418 approximated
the national average of $846.76 and $336.42, respectively.

55.   The calendar 2005, 2006 and 2007 Medicare Part B pay rates received
from Medicare by defendants ROC, Ciuba and Cabelka for each of roughly
43 daily treatments (CPT Code 77418) for each IMRT patient approximated
$485.67, $481.53, and $448.91, respectively. Therefore, the physician's
corresponding total treatment revenue for radiation treatments alone for each
IMRT patient approximated $20,883.90, $20,705.70, and $19,303.22,
respectively.

## 3DCRT Data

56.   During calendar 2006, the Cancer Center billed to all payors
approximately 300 3DCRT simulations (CPT Code 77295) and 6,100 daily
3DCRT treatments (CPT Code 77414) and hundreds of other 3DCRT-
related charges.

57.   During calendar 2007, the Cancer Center billed to all payors
approximately 320 3DCRT simulations (CPT Code 77295) and 7,100 daily
3DCRT treatments (CPT Code 77414) and hundreds of other 3DCRT-
related charges.

58.     During calendar 2006, the Cancer Center's Hospital Technical Medicare Part A pay rates for CPT Codes and 77414 approximated the national average of $862.12 and $82.09, respectively.

59.     During calendar 2007, the Cancer Center's Hospital Technical Medicare Part A pay rates for CPT Codes 77295 and 77414 approximated the national average of $848.76 and $126.57, respectively.

60.     The calendar 2005, 2006 and 2007 Medicare Part B pay rates received from Medicare by defendants ROC, Ciuba and Cabelka for each of roughly 33 daily treatments (CPT Code 77414) for each 3DCRT patient approximated $66.11, $65.67 and $101.26, respectively. Therefore, the physicians' corresponding total treatment revenue for radiation treatments alone for each 3DCRT patient billed to Federal Payors approximated $2,181.70, $2,167.18 and $3,341.45, respectively.

PSI Data

61.     During calendar 2006, the Cancer Center billed to all payors 11 PSI pre-treatment plans under CPT Code 77305.

62.     During the six months from January 2007 through June 30, 2007, the Cancer Center billed to all payors two PSI pre-treatment plans under CPT Code 77305.

63.     On information and belief, during calendar 2006, the Cancer Center billed roughly 11 post-implant CTs (CPT code 77290, national average Medicare Part B pay rate of $234.09) for which the required post-treatment plan was not done thereby rendering the CTs frivolous.

64.     During 2006 and 2007, national average Medicare Part A (technical) pay rates for CPT Code 77305 were $103.09 and $96.72, respectively. Medicare Part B (physician professional) pay rates for CPT Code 77305 during 2006 and 2007 were $111.80 and $97.38, respectively.

65.     During calendar 2006 and 2007, defendant ROC's Physician Medicare Part B pay rates for CPT Code 77305 approximated $35.59 and $32.93, respectively.

Chronology of Events

66.    Continuously, since at least 2002, defendant Cancer Center has delivered an array of radiation therapies including some combination of intensity-modulated radiation therapy ("IMRT"), three-dimensional conformal radiotherapy ("3DCRT"), Conventional Radiation Therapy and Prostate Seed Implant ("PSI").

67.    In 2004, RCI conducted[kss5] at least two conference calls with TMC personnel and made seven site visits to the Cancer Center covering a total of 26 days.

68.    On or about February 27, 2006[kss6], Cancer Center and TMC management personnel participated in an "introductory meeting" to introduce[kss7] an RCI consultant to the Cancer Center.

69.    TMC's Cancer Center Weekly Report dated February 27, 2006 reported "Currently the staff does not have anything that explains what CPT codes are billed for levels, description of codes, etc." and "The staff is not aware of how the physicians are documenting review or charging for BAT."

70.    TMC's Cancer Center March 16, 2006 Weekly Report contains this notation: "Discovered during the IMRT chart audit that none of the BAT images had MD signatures or dates."

71.    Until June 2007, the BAT ultrasound unit was being used for ultrasound guidance (CPT code 76950) to set up delivery of radiation to IMRT patients.  Under CMS rules, code 76950 contains both hospital technical and physician professional components.  Hospital technical was to be billed daily, while physician professional was to be billed at the physician's discretion but only with appropriate physician documentation separate from the physician's "on treatment management" note.

72.    In June 2007, the BAT ultrasound technology was utilized less frequently because of the implementation of stereoscopic X-ray guidance for prostate IMRT treatments.

73.    On April 25-27, 2006, TMC's own Cancer Center Weekly Report contains the following notations:

Data needs to be reviewed as the last step in the investigation surrounding the misadministration on 4.18.2006. . .

Lack of physician orders for work performed and services provided. . . There are incomplete orders to begin the planning process and in particular this week, staff obtained diode readings without orders. . .

Draft formulation/prescription will be presented to the physicians before the end of May. . .

Email communication with the physicians indicated that staff were instructed not to perform any service without a written physician order.

74.    In June 2006 and November 2006, in Austin, Texas, Revenue Cycle, Inc. delivered Coding and Reimbursement training seminars for TMC personnel during which participants were instructed on detailed Medicare requirements for 3DCRT and IMRT reimbursement including the following[kss8] language that applies specifically to IMRT:

a.  Documentation in the patient's medical records must support the reasonable and necessary requirements as outlined under the coverage and limitations sections of this LCD and must be available to the Carrier for review upon request.

b.  The [medical doctor's signed] prescription must define the goals and requirements of the treatment plan, including the specific dose constraints for the target(s) and nearby critical structures.

c.  A statement by the treating physician documenting the special need for performing IMRT on the patient in question, rather than performing conventional or 3-dimensional treatment planning and delivery.

75.    Some time in November 2006, a Cancer Center Medical Physicist coined the phrase "pretend IMRT" to describe the IMRTs then being provided by the Cancer Center.

76.    RCI's December 8, 2006 Weekly Report on the Cancer Center

14

contained this notation: "During the Bi-weekly dosimetry meeting discussion surrounding the level of complexity of IMRT plans. On occasion we are not meeting the ACR and CMS standards for IMRT plans."

77.    From December 18, 2006 until October 30, 2007, Relator was employed by Team Staff Rx as a Medical Physicist assigned to the Cancer Center.

78.    In mid-December 2006, shortly after arriving at the Cancer Center, Relator became aware through conversations with other Cancer Center personnel that not all patients were being seen by their radiation oncologists every week as required by CMS. These Cancer Center personnel included Jaylynn Wheeler and various therapists. At the same time, Relator personally observed inadequate documentation of treatment at the Cancer Center while performing ongoing Physics review of all patient charts then undergoing radiation treatment during her first month at the Cancer Center.

79.    Upon Relator's entry into service at the Cancer Center, in mid-December 2006, other medical physicists told Relator that many IMRT patients were not receiving the average of five leaf segments per beam required for Medicare reimbursement.

80.    Relator personally confirmed, during the new-patient chart reviews that Relator began in December 2006, that many IMRT patients, including a specific patient identified here as Patient Y, were not receiving the average of five leaf segments per radiation beam required for Medicare reimbursement.

81.    Relator was subsequently provided Medicare IMRT plan requirements previously provided to defendants Cabelka and Ciuba. In light of this documentation, Relator and other Cancer Center personnel determined that numerous patient plans did not meet Medicare eligibility requirements.

82.    Near the end of January 2007, Relator was doing the post-implant prostate seed dosimetry and was looking at a plan with iso dose lines displayed on the screen. Defendant Ciuba stopped by and looked over Relator's shoulder at the screen and asked what Relator was looking at. Relator responded, "Malpractice." Ciuba said "they are not my patients." Relator rejoined with something to the effect that they were patients of his medical  practice partner and the Cancer Center. After that, Ciuba just

walked away.

83.     Around the end of February or beginning of March 2007, Relator instructed another medical physicist to send an e-mail to Ciuba informing Ciuba that two specific IMRT cases did not meet the minimum Medicare 5-segment-average criterion for IMRT treatment.

84.     Ciuba responded to the effect that Relator and her colleague could view the cases "however they wanted," but Ciuba was going to view them as IMRTs.

85.     During her first-month review of patient charts, Relator personally observed that the Cancer Center was routinely billing patients and payors for IMRT plans and treatments where no statement of medical necessity was documented, prescription constraints were not provided by the MD, and the minimum average number of segments required by Medicare to qualify the plan of treatment as IMRT were not met.  In addition, Relator noted that the localization ultrasound images acquired every treatment day for the prostate patients' set-up accuracy were never examined by a medical doctor for the entire course of treatment for any prostate IMRT patient.

86.     Continuing medical management is a professional service required by CMS to demonstrate appropriate medical supervision of patient treatments. In IMRT, medical supervision of patient treatment is even more critical than for conventional radiation therapy.  Yet, during her first-month review of patient charts, Relator personally observed that MD notes documenting weekly continuing medical management of the patients were missing from the majority of the charts for some weeks.  Likewise, Relator personally observed return-treatment patient (patients who have previously completed a course of therapy and have returned for treatment of a metastatic site or a new primary site) charts in which weekly patient data sheets were initialed by Registered Nurses ("RNs") but not, as required, by doctors.

87.     On the morning of January 11, 2007, the Cancer Center held a meeting to, among other things, report allegations of Medicare fraud to TMC General Counsel Tripp Layfield.  Several TMC employees, including Relator, attended.  In his summary of the meeting, the Cancer Center's then Administrative Director ("AD") noted that "physician prescriptions for any treatment" were "missing or incomplete" and stated as follows:

CMS is very clear that a written directive is necessary for any patient related task. This includes all aspects of radiation oncology, even if that task is inherent to the treatment delivery process. . . All radiation oncology staff and physicians have been informed not to proceed with treatment planning or patient care delivery without a written prescription or directive. Also, the treatment plans created by dosimetry staff and approved by the physician must have the physician signature and date before the initiation of treatment. The practice of "plan approved, signature pending" will end immediately.

88.     At about the same time as the January 11, 2007 meeting, the Cancer Center's AD described the Cancer Center to Relator as "a castle standing in a pool of gasoline just waiting for someone to throw in a match."

89.     Sometime after January 21 and before January 29, Relator met with TMC's Chief Medical Officer ("CMO") to discuss a medical misadministration event. During that meeting, the CMO asked Relator if she would recommend to her family members that they get cancer treatment at the Cancer Center. She responded that she would not.

90.     During a January 29-31, 2007 RCI site visit, Relator, defendant Cabelka, an RCI consultant and the President of RCI engaged in an informal discussion about the observed lack of weekly patient examinations by radiation oncologists with records review for continuing medical management of patients. For example, the localization ultrasound images acquired every treatment day for IMRT prostate patients were never examined by any doctor for the entire course of treatment for any patient. During this discussion, Cabelka told Relator that RCI's President had told him that weekly patient examinations with records review by radiation oncologists for continuing medical management of patients were not required. RCI's President immediately responded to Cabelka to the effect of, "As I have advised you in the past, these activities, with complete documentation, are required by Medicare."

91.     Around the beginning of January 2007, Relator obtained a copy of the CMS LCD for IMRT (L12351) which duplicates in material ways the contents of LCDs 13160 and 24970. Relator, who was informed that defendants Ciuba and Cabelka had previously received copies of LCD L12351, later saw it in the offices of both defendants.

92.   RCI's January 29-31, 2007 Site Visit Report (hereinafter "January Site Visit Report"), circulated to TMC managers and Cancer Center doctors, noted *inter alia* the following:

    a.   It is a Medicare requirement that all services performed be located in the patient chart and available for review.

    b.   Local coding expertise [at TMC] is not at the level necessary to insure compliance.

    c.   Policies and procedures that have been submitted [to TMC] by RCI months ago for review have still not been forwarded for implementation and approval.

    d.   [A specific TMC employee] has been assigned the responsibility of coding and reimbursement. She is not adequately prepared from a knowledge standpoint or resource standpoint. This visit she was introduced to ICD Coding, CPT coding, HCPCS coding, APCs, charge capture, documentation and the need to know [billing systems] SMS, Omega and Athena. She is completely unaware of the hospital programs and does not have log ins for them. This was pointed out as a necessity. . . Lynne is positive given her situation but unless the deficiencies are quickly attended to she is in a position to not succeed.

    e.   Only one [CPT code] 77470 is appropriate per patient course. One chart reviewed had 3 charged on one patient. It appeared as if only a guide was being followed to the charging instead of understanding the reasoning for the capture. There must be reasoning that takes pace with each code instead of just submitting codes from a list or habit.

93.   The January Site Visit Report detailed the following service overcharges, identifying them by patient name:

    a.   Patient A (IMRT). On October 25, 2006, the IMPAC system showed billings for three port films (CPT code 77417, average Medicare pay rate of $43.42) when no port films were recorded in the patient chart. On 12/1/06 and 12/12/06 IMRT Plan (CPT 77301, average Medicare pay rate of $826.12) and 77470 (average pay rate of $343.25) were billed for a second and third time.

b. Patient B. On or about August 25, 2006, IMRT was performed on this patient. On August 29, 2006, CPT 77301 was billed when not clearly documented and not complete. On October 19, 2006, 77470 was billed a second time.

94.   The January Site Visit Report also describes a number of failures to bill for services apparently documented in the files but not entered in the IMPAC system.

95.   At the conclusion of her first 8-week contract with Team Staff Rx, Relator began work as the Cancer Center's temporary Lead Medical Physicist and continued in this role until about October 31, 2007.

96.   Relator personally performed end-of-treatment reviews of at least half Cancer Center Radiation Oncology patients completing an external beam treatment course, including both IMRT and 3DCRT treatment plans, between May 2007 and October 31, 2007.

97.   Relator performed new patient and on-going weekly patient chart reviews of IMRT patient files, including IMPAC reports used to accumulate CPT codes to be billed through to payors, during which Relator personally observed that all IMRT plans billed by the Cancer Center from January 2007 through October 2007 to all payors were ineligible for reimbursement by Federal Payors under applicable regulations because (a) none of the IMRT patient charts contained a pre-treatment prescription with dose constraints signed by a radiation oncologist and (b) none of the patient charts contained medical justification for IMRT.

98.   Through her personal review of all 2006 PSI cases for the Quality Management Program, including IMPAC reports used to accumulate CPT codes to be billed through to payors, Relator personally observed that at least four of eleven PSI cases were ineligible for reimbursement by Federal Payors under applicable regulations because these PSI patient charts contained a pre-treatment prescription signed by a radiation oncologist where the post implant dosimetry that Relator completed indicated that less than 60 percent of the prescription dose was delivered.

99.   Under-dosing a radiation therapy by 20 percent or more is a reportable medical misadministration event under Georgia Administrative Code and, in the PSI context, renders the PSI treatment course non-therapeutic and,

therefore, of no medicinal value under applicable clinical standards.

100.   Among the 2006 PSI charts reviewed by Relator, most showed the required post-implant CT scans, but none reflected the required post-implant treatment plan also known as "dosimetry". The absence of such dosimetry renders the CT scan meaningless.

101.   The Cancer Center's AD was terminated on or about March 31, 2007 after signing a 5-year non-disclosure agreement which TMC required him to sign in exchange for a "severance" package.

102.   On April 3-4, 2007, RCI conducted a site visit and two training sessions at the Cancer Center.

103.   Upon arrival at the Cancer Center on April 3, 2007, RCI Director of Consulting, Kelli Weiss, met [kss9]with TMC Vice President Kevin Sass who confirmed that the training expectations included that staff be "educated as to the appropriate documentation to support the services performed, aware of the expectation of 100% participation by the department in . . . auditing and correct charge capture, [and] aware that ownership of the processes and follow-through is an expectation."

104.   Despite Sass's confirmation of the 100%-participation requirement, several Radiation Oncology personnel arrived late[kss10], left early or did not appear at all during the two days of the RCI visit. The April 3 training session did not begin until 3 pm and was over by 5 pm. Weiss wrote: "[W]e do not feel adequate time was spent on the training nor adequate knowledge of information presented was displayed [sic] by the attendees. . . RCI fully expects more training to be necessary based on feedback or lack thereof of an understanding of the process."

105.   The April 4, 2007 training session was planned as a full-day seminar for all Radiation Oncology personnel including defendants Ciuba and Cabelka. The session was focused on documentation, charge capture and billing processes and "customized to fit the issues found during the audit" completed as part of the April 3 training. To enable 100% seminar participation, Radiation Oncology closed for the day except for some patients being treated by temporary therapists.

106.   Despite RCI's efforts, defendants Ciuba and Cabelka were away on

vacation on April 4, 2007 and, therefore, missed the training. However, an ROC employee, identified in RCI's Site Visit Summary as the "billing person" for Ciuba and Cabelka, is listed as present at the training.

107.   The April 4 presentation reiterated[kss11], among other things, the Medicare IMRT reimbursement requirements detailed above, in paragraph 52 and stressed the "necessity to [obtain] obtain orders from the physicians prior to initiating work" which RCI flagged as "a huge area of concern[kss12]."

108.   RCI's Site Visit Summary concludes with this recommendation: "Periodic visits to ensure recommendations are implemented and consistent over time.  This has been an issue in the past where progress is made and then ultimately reverts [sic] back to old habits and processes." To Relator's knowledge, TMC has not engaged RCI to perform the recommended periodic visits.

109.   Additional documentation in possession of The Cancer Center of other instances in which The Cancer Center billed payors for IMRT treatments that were not performed in accordance with Medicare requirements where documentation of the required physics QA is absent.

110.   The average Cancer Center prostate cancer patient diagnosed in 1998 was significantly less likely (71%) than the National Cancer Database average (83%) to survive over five years.  This 12% survival rate shortfall is extraordinary given that at a 2% variance from the National Database average is considered significant in the industry.

111.   Sometime during the spring of 2007, Relator spoke with defendant Ciuba about his professional training to deliver IMRT treatments.  Relator asked Ciuba what kind of IMRT-specific training he had received and whether he had attended any professional seminars to receive IMRT training.  Ciuba responded to the effect that "we listen to audio tapes." When Relator followed with a question to the effect of, "When you go to professional meetings, have you attended a seminar on IMRT?" Ciuba responded again to the effect of "We use audio tapes."

112.   Around the end of June 2007 or beginning of July 2007, Relator initiated a Cancer Center policy that an end-of-treatment billing review of every patient chart be completed by the radiation therapists and the medical physicists upon completion of each patient's course of treatment for the

category of charge for which each specialty (radiation therapist or medical physicist) was responsible.

113.  On multiple occasions between January and October 2007, Relator personally informed TMC management personnel of discrepancies between billings and the radiation oncology services reflected in patient files reviewed by Relator.

114.  Relator's attempts to get TMC to address and correct the treatment and documentation irregularities described in the foregoing paragraphs were rebuffed without explanation by TMC and Cancer Center management. The misadministrations should have been reported to the state as she recommended to executive management, in January 2007, and to TMC's General Counsel, in October 2007.

115.  On or about July 3, 2007, Relator reported to a temporary radiation oncologist a dosage near-miss sentinel event in which IMRT Patient X's superior spinal cord had an approved, signed second "boost plan" where the spinal cord would have been treated to 60 gray where 45 gray was the maximum safely allowed. If this plan had been delivered as originally written and approved, Patient X would either have died or become a quadriplegic.

116.  Shortly after July 23, 2007, Relator made a copy of Patient X's chart for inclusion in the treatment variance file. Later, TMC's CMO asked Relator to bring to him Patient X's chart. Relator again made a copy of the chart to take it to the CMO. At that time, Relator noticed that the chart had been altered by the defendant Cabelka to make it appear that defendant had examined the patient and reviewed the chart on July 17 and 23.

117.  When Relator saw that the chart had been altered, she immediately took it to TMC's General Counsel who immediately left the building with Relator, crossing the parking lot between the buildings to meet in person with the CMO.

118.  With the General Counsel and CMO in the room, Relator explained how she had discovered the alteration.

119.  Near the end of July 2007, Relator met in person with the CMO, VP and TMC's Internal Audit Director. During the meeting, Relator said that

she felt as if she was getting "blamed for all of the problems" at the Cancer Center. The Internal Audit Director replied that "others" had previously brought forward similar allegations but were not willing to "be witnesses."

120.   In July or August 2007, as part of a corrective action in response to the sentinel event described in the preceding paragraphs, Relator prepared site-specific IMRT Dosimetry Worksheet containing standard IMRT prescription elements with an MD signature required prior to initiation of patient planning.  This worksheet was sent by e-mail to members of TMC's executive management team. As of March 2008, Relator was informed no such worksheet was yet being used at the Cancer Center.

121.   Prior to August 2007, defendant Cabelka had not obtained specialty PSI training outside of a residency program.  Pursuant to a corrective action plan initiated by Relator, Cabelka attended the Seattle Prostate Institute training in August 2007.

122.   On September 18, 2007, at 12:44 p.m. EDT, Relator sent an e-mail to TMC's Internal Audit Director, stating, in part: "Dr. Cabelka *does not ever write* prescriptions . . . ."

123.   On September 18, 2007, at 3:30 p.m. EDT, Relator sent an e-mail to defendant Cabelka requesting that he "complete and approve Rx for [Patient XX's] boost.  Plan is signed at 100% and 6mev.  2 fxs remain."  At that point in time, Patient XX had received three of five non-IMRT breast cancer radiation boost treatments without a physician's prescription.

124.   On September 19, 2007, a visiting radiation oncologist from the American College of Radiation Oncology privately asked Relator several questions about what motivated her to review prostate patient charts for calendar 2006.

125.   Later the same day, during a closing conference with the visiting oncologist and several Cancer Center personnel including Relator, the oncologist announced that Relator would be "leaving" the Cancer Center. This announcement came as a surprise to Relator who had previously expressed to TMC management a strong interest in staying on in a permanent role and was told by a TMC VP that she could interview for the permanent staff medical physicist position once the new permanent lead medical physicist had assumed his position.

126.   On September 24, 2007, Relator completed and filed a Concern Management/CQI Variance Report noting that Cabelka's Patient XX still had no prescription on file supporting her boost treatment plan.

127.   On October 24, 2007, Relator sent an e-mail to TMC's General Counsel, informing him that she had "applied for a permanent position [at the Cancer Center]" and stating: "I have been told that the medical center [sic] has filed a negative report concerning me with TeamStaff Rx and will not renew my contract. Would you be able to obtain a copy since they ignore my requests?"

128.   Shortly thereafter, Relator was told by a TMC VP that, in fact, TMC had never filed a negative report with TeamStaff Rx or with TMC's Human Resources department.

129.   Relator was not permitted to interview for the permanent position at the Cancer Center and sought employment elsewhere after her Cancer Center contract terminated on October 30, 2007.

130.   Shortly before Relator finished working at the Cancer Center, the new lead medical physicist told Relator that a TMC VP had told him that the real reason Relator was not invited to interview for the permanent staff position was that Relator had gone to TMC's upper management with reports of problems at the Cancer Center.

131.   Of the TMC staff members who were present at the January 11, 2007 meeting on Medicare fraud, only one is still employed at TMC.

132.   Defendants Cancer Center, ROC, Cabelka and Ciuba actually knew or were reckless in not knowing that they were submitting false claims for cancer therapies not performed and documented in accordance with CMS regulations.

Count One

*Submission of False Claims for Services not Rendered*

133.   Relator repeats and re-alleges each and every allegation of the foregoing paragraphs of this Complaint, and incorporates them by reference herein as if set forth at length.

134.   Defendants presented, or caused to be filed with Federal Payors claims for radiation therapy cancer treatments with knowledge that such claims were false in that such treatments were not delivered as defined by applicable federal regulatory requirements or with reckless disregard of facts and circumstances that would have demonstrated the falsity of the claims.

135.   By reason of the violation of 31 U.S.C. § 3729(a)(1- 4) defendants have knowingly or recklessly damaged the United States Government in an amount to be determined.

Count Two
*Conspiracy to Submit False Claims*

136.   Relator realleges and incorporates the allegations of paragraphs 1–135 as if fully set forth herein.

137.   Defendants combined, conspired, and agreed together to defraud the United States by knowingly submitting false claims to the United States for the purpose of getting the false or fraudulent claims paid or allowed and committed the other overt acts set forth above in furtherance of that conspiracy, all in violation of 31 U.S.C. § 3729(a)(3), causing damage to the United States.

Count Three
*Submission of False Claims in Violation of O.C.G.A. § 49-4-168.1*

138.   Relator realleges and incorporates the allegations of paragraphs 1–132 as if fully set forth herein.

139.   On information and belief, defendants presented, or caused to be presented Georgia Medicaid claims for radiation therapy cancer treatments with knowledge that such claims were false in that such treatments were not delivered as defined by applicable regulations or with reckless disregard of facts and circumstances that would have demonstrated the falsity of the claims.

140.   By reason of the violation of O.C.G.A. § 49-4-168.1 defendants have knowingly or recklessly damaged the government of the State of Georgia in an amount to be determined.

WHEREFORE, plaintiff United States of America, ex rel. Shirley Small, prays that:

a) Judgment be entered in favor of plaintiff and against defendant which awards plaintiff damages in an amount three times the amount of all sums paid by the United states of America and the State of Georgia as a result of the defendants' violations of 31 U.S.C. § 3729; and

b) That judgment be entered in plaintiffs favor and against defendants in an amount equal to the number of false claims that will be proven at trial, as provided for in 31 USC § 3729(a) and imposition of a civil penalty of $11,000 per claim; and

c) That plaintiff-Relator be awarded the maximum percentage of the government's recovery as provided by statute; and

d) That plaintiff-Relator be awarded all costs of this action including attorney's fees and court costs; and

e) That plaintiff-Relator recover such further and additional relief as this Court may deem just or proper.

Plaintiff United States ex rel. Shirley T. Small demands a jury trial against defendant.

Respectfully submitted this 1st day of April, 2008.

[Signatures located on next page]

James (Jay) Sadd, Esq.
Slappey & Sadd, LLC
6100 Lake Forrest Dr., Suite 570
Atlanta, Ga. 30328
Tel. 404.255.6677
Ga. Bar No. 622010

Kurt S. Schulzke, Esq.
1025 Rose Creek Dr.
Suite 620-171
Woodstock, Ga. 30189
Tel. 770.517.4527
Ga. Bar No. 630298

Attorneys for Plaintiff-Relator